IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOHN O. MARABLE, JR.,
             Plaintiff,

v.

Civil Action No. 3:18-cv-03291-N-BN

DEPARTMENT OF COMMERCE,
             Defendant.

**BRIEF IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

ERIN NEALY COX
United States Attorney

Lisa R. Hasday
Assistant United States Attorney
Texas Bar No. 24075989
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8737
Facsimile:   214-659-8807
lisa.hasday@usdoj.gov

Attorneys for Defendant

# Table of Contents

I.     Summary ................................................................................................ 1

II.    Live Pleadings.................................................................................... 3

III.   Facts ................................................................................................... 3

    A.     After working at the USPTO for approximately nine months, Plaintiff resigned in lieu of being terminated. ............................... 3

    B.     Due to Plaintiff's substandard performance when he worked at the USPTO, the agency chose not to rehire him.............................. 10

    C.     Plaintiff filed an administrative complaint and the instant federal complaint. ................................................................................... 11

IV.   Argument and Authorities.................................................................. 13

    A.     Standard of Review................................................................... 13

    B.     Defendant is entitled to summary judgment on Plaintiff's Title VII and ADEA claims. ................................................................. 14

          1.     Plaintiff named the wrong defendant.............................. 14

          2.     Plaintiff has not shown discrimination or retaliation...................... 15

          3.     Plaintiff has not shown a hostile work environment....................... 22

    C.     Defendant is entitled to summary judgment on Plaintiff's Fair Labor Standards Act claim. ................................................................. 27

V.    Conclusion ........................................................................................ 29

# Table of Authorities

## Cases

*Al-Beshrawi v. Chao*,
   No. 5:06CV369, 2007 WL 1231477 (N.D. Ohio Apr. 23, 2007) ........................... 28–29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................ 13

*Bell v. Bank of Am.*,
   171 F. App'x 442 (5th Cir. 2006) ....................................................................... 17

*Burgos v. Sw. Bell Tel. Co.*,
   20 F.3d 633 (5th Cir. 1994) ................................................................................ 13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 13, 14

*Cook-Adams v. Sw. Bell Tel. Co.*,
   No. 3:97-CV-1629, 1998 WL 355475 (N.D. Tex. June 30, 1998) .............................. 22

*Cox v. Brookshire Grocery Co.*,
   919 F.2d 354 (5th Cir. 1990) .............................................................................. 28

*Eason v. Thaler*,
   73 F.3d 1322 (5th Cir. 1996) ............................................................................. 13

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ............................................................................................... 13

*Fontenot v. Univ. of Tex. M.D. Anderson Cancer Ctr.*,
   No. CV H-06-3756, 2008 WL 11487950 (S.D. Tex. Apr. 15, 2008) .......................... 21

*Gomez-Perez v. Potter*,
   553 U.S. 474 (2008) ......................................................................................... 1, 28

*Green v. Brennan*,
   136 S. Ct. 1769 (2016) ......................................................................................... 1

*Heggemeier v. Caldwell Cnty., Tex.*,
   826 F.3d 861 (5th Cir. 2016) .............................................................................. 15

*Herrera v. Millsap*,
   862 F.2d 1157 (5th Cir. 1989) ............................................................................ 13

*Higareda v. U.S. Postal Serv.*,
  5 F.3d 1495 (5th Cir. 1993)........................................................................ 17

*Honeycutt v. Long*,
  861 F.2d 1346 (5th Cir. 1988)..................................................................... 14

*Jackson v. DaimlerChrysler Corp.*,
  No. 3:03-CV-614-P, 2004 WL 690840 (N.D. Tex. Mar. 30, 2004) ............................. 27

*Jenkins v. State of La., Through Dep't of Corrs.*,
  874 F.2d 992 (5th Cir. 1989)...................................................................... 21

*Leal v. McHugh*,
  731 F.3d 405 (5th Cir. 2013)........................................................................ 1

*Machinchick v. PB Power, Inc.*,
  398 F.3d 345 (5th Cir. 2005)....................................................................... 18

*Marable v. Dep't of Commerce*,
  No. 3:17-cv-03030-D, 2018 WL 3869577 (N.D. Tex. Aug. 15, 2018) ...................... 12

*McCoy v. City of Shreveport*,
  492 F.3d 551 (5th Cir. 2007)............................................................. 15, 18, 21

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ........................................................................ 15, 18

*Miller v. Locke*,
  No. 1:08-CV-1149 (AJT/TCB), 2009 WL 1675486 (E.D. Va. June 12, 2009)............ 18

*Oden v. Oktibbeha Cnty., Miss.*,
  246 F.3d 458 (5th Cir. 2001)........................................................................ 1

*Pollak v. Lew*,
  542 F. App'x 304 (5th Cir. 2013) ................................................................ 16

*Porter v. Adams*,
  639 F.2d 273 (5th Cir. 1981)........................................................................ 1

*Quevedo v. Army & Air Force Exch. Serv.*,
  234 F.3d 29 (5th Cir. 2000)..................................................................... 14–15

*Ramsey v. Henderson*,
  286 F.3d 264 (5th Cir. 2002)............................................................... 22–23, 27

*Sandstad v. CB Richard Ellis, Inc.*,
    309 F.3d 893 (5th Cir. 2002) ..................................................................... 15

*SEC v. AMX, Int'l, Inc.*,
    7 F.3d 71 (5th Cir. 1993) ..................................................................... 13–14

*Septimus v. Univ. of Houston*,
    399 F.3d 601 (5th Cir. 2005) ..................................................................... 18

*Shackelford v. Deloitte & Touche, LLP*,
    190 F.3d 398 (5th Cir. 1999) ..................................................................... 18

*Smith v. Berry Co.*,
    165 F.3d 390 (5th Cir. 1999) ....................................................................... 2

*Spencer v. FEI, Inc.*,
    725 F. App'x 263 (5th Cir. 2018) ............................................................. 19

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ................................................................................. 18

*Stone v. La. Dep't of Revenue*,
    590 F. App'x 332 (5th Cir. 2014) ............................................................. 27

*Strong v. Univ. Healthcare Sys., L.L.C.*,
    482 F.3d 802 (5th Cir. 2007) ..................................................................... 21

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ........................................................................... 15, 21

*Valcho v. Dallas Cnty. Hosp. Dist.*,
    658 F. Supp. 2d 802 (N.D. Tex. 2009) ..................................................... 28

*Varma v. Gutierrez*,
    421 F. Supp. 2d 110 (D.D.C. 2006) .......................................................... 14

*Von Graupen v. Burlington Coat Factory of Tex., L.P.*,
    No. 4:11-CV-868-A, 2013 WL 1143359 (N.D. Tex. Mar. 19, 2013) .......... 27

*Weller v. Citation Oil & Gas Corp.*,
    84 F.3d 191 (5th Cir. 1996) ..................................................................... 23

*Wood v. Fla. Atl. Univ. Bd. of Trustees*,
    432 F. App'x 812 (11th Cir. 2011) ........................................................... 11

*Wright v. Brown*,
    993 F.2d 1541 (4th Cir. 1993).................................................................. 21

*Young v. Dallas Indep. Sch. Dist.*,
    No. 3:16-CV-543-N-BF, 2017 WL 4326009 (N.D. Tex. Sept. 6, 2017) ..................... 27

## Statutes, Regulations, and Rules

5 U.S.C. § 7703(b)(1) .......................................................................... 13

28 U.S.C. § 1295(a)(9) ........................................................................ 13

29 U.S.C. § 201 ................................................................................... 1

29 U.S.C. § 213(a)(1) .......................................................................... 28

29 U.S.C. § 255(a) .............................................................................. 28

29 U.S.C. § 633a ................................................................................. 1

35 U.S.C. § 1(a) ................................................................................. 14

42 U.S.C. § 1981a(b)(1) ........................................................................ 1

42 U.S.C. § 2000e ..................................................................... 1, 14, 17

5 C.F.R. §§ 315.801–802 ...................................................................... 16

5 C.F.R. § 315.804(a) .......................................................................... 16

5 C.F.R. § 731.202(b)(1) ...................................................................... 10

29 C.F.R. § 1614.409 ........................................................................... 13

29 C.F.R. § 1614.501 ............................................................................ 2

Fed. R. Civ. P. 5(b)(2) ......................................................................... 30

Fed. R. Civ. P. 56 .............................................................................. 13

## I.        Summary

Plaintiff John O. Marable, Jr., a former employee of the U.S. Patent and

Trademark Office (USPTO), sues the Department of Commerce.  He alleges that, during

his nine months of employment at the USPTO and when he applied for reemployment, he

was subjected to, at varying times, race and age discrimination, retaliation, and a hostile

work environment in violation of Title VII of the Civil Rights of 1964, as amended, 42

U.S.C. §§ 2000e, *et seq*., and the Age Discrimination in Employment Act of 1967, as

amended, 29 U.S.C. § 633a.[1]  Plaintiff is a 66-year-old African-American man.  Doc. 3 at

2; Appendix (App.) at 291.  Plaintiff also alleges that he worked unpaid overtime hours in

violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq*.

He requests reinstatement, front pay, back pay, compensatory damages, punitive

damages, employment benefits, litigation expenses, and injunctive relief.[2]  *See* Doc. 3 at

15–16.  Defendant seeks summary judgment on all of Plaintiff's claims.

---

[1] The federal government is prohibited from discriminating against any of its employees, or applicants for employment, on the basis of, among other factors, race or age.  Title VII requires that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The Age Discrimination in Employment Act similarly requires that personnel actions affecting federal employees or applicants for federal employment "who are at least 40 years of age . . . be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  The Supreme Court has not decided whether Title VII prohibits retaliation against federal employees who engage in protected conduct.  *See Green v. Brennan*, 136 S. Ct. 1769, 1774 n.1 (2016).  The Fifth Circuit, however, has construed the statute to prohibit federal employers from retaliating against their employees.  *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981).  With respect to the ADEA, it is settled that the statute prohibits retaliation against federal employees.  *See Gomez-Perez v. Potter*, 553 U.S. 474, 477 (2008).

[2] Punitive damages are not recoverable against a government, government agency, or political subdivision pursuant to Title VII.  *See* 42 U.S.C. § 1981a(b)(1); *see also Oden v. Oktibbeha Cnty., Miss*., 246 F.3d 458, 465–66 (5th Cir. 2001) ("[T]he Civil Rights Act of 1991 . . . precludes plaintiffs [asserting a Title VII claim] from recovering punitive damages against governments, government agencies, and political subdivisions.").  In addition, both punitive and compensatory damages as well as loss of fringe benefits "are inapplicable to federal employees suing under the ADEA."  *Leal v. McHugh*, 731 F.3d 405, 416 n.11

Plaintiff's Title VII and ADEA claims should be dismissed because Plaintiff failed to sue the director of the USPTO, the only proper defendant for those claims.  Moreover, Plaintiff's discrimination and retaliation claims cannot survive even the prima facie analysis.  Regarding the discrimination claim, although Plaintiff has shown that he is a member of protected classes, and Defendant concedes that his proposed removal and subsequent non-selection for reemployment were both adverse actions, Plaintiff has *not* shown that he was treated less favorably than similarly situated employees outside his protected groups.  As for Plaintiff's retaliation claim, Plaintiff has not exhausted any such claim.  In addition, any retaliation claim would fail on the merits.  Plaintiff has not shown any causal connection between his protected activity and his non-selection, which is the only action he claims was retaliatory.  And, with respect to both the discrimination and retaliation claims, the USPTO had legitimate, performance-based reasons for its actions, and Plaintiff cannot show pretext.  Plaintiff has also failed to establish a hostile work environment.  Specifically, he has not shown, as he must, that any alleged harassment was based on a protected characteristic; that it affected a term, condition, or privilege of employment; and that the USPTO knew or should have known of the alleged harassment and failed to take prompt remedial action.  Lastly, Plaintiff's Fair Labor Standards Act claim fails because, as Plaintiff acknowledges, Plaintiff's position with the USPTO was exempt under the FLSA.  In sum, Plaintiff's entire case must be dismissed.

---

(5th Cir. 2013) (citing 29 C.F.R. § 1614.501); *see also Smith v. Berry Co*., 165 F.3d 390, 396 (5th Cir. 1999) (holding that "punitive damages and damages for mental pain and suffering" are not available in connection with a claim pursuant to the ADEA).

## II.       Live Pleadings

The live pleadings are Plaintiff's "Complaint," filed on December 14, 2018, Doc.

3, and "Defendant's Answer to Plaintiff's Complaint," filed on April 12, 2019, Doc. 13.

## III.       Facts

### A.       After working at the USPTO for approximately nine months, Plaintiff resigned in lieu of being terminated.

Plaintiff began working at the USPTO, in the agency's Texas Regional Office in

Dallas, on September 19, 2016.  Doc. 3 at 3 ¶ 1; App. at 9, 295.  He worked as a patent

examiner, and was paid a salary at the GS-9, step 10 level.  *Id*.  Plaintiff was subject to a

one-year probationary period, which began on his first day.  *Id*. at 9, 296.  In addition, for

approximately the first four months of Plaintiff's employment at the USPTO, Plaintiff—

like all new patent examiners—attended training, known as "the Academy."  *Id*. at 296–

97.  The training that Plaintiff attended was in Dallas.  *Id*. at 296.  His instructors were

Mark Zimmerman, initially, and Mark Featherstone, subsequently.  *Id*. at 92–94, 103–05,

298–99, 337.  After completing "the Academy," Plaintiff worked in what is known as an

"art unit."  *Id*. at 65, 297.  Because Plaintiff had experience as a mechanical engineer,

including earning a bachelor's degree in the subject, the USPTO assigned Plaintiff to

work in an art unit that reviewed applications for patents involving mechanical

engineering.  *Id*. at 5–6, 294, 297.  Plaintiff's first-level supervisor in the art unit was

Thanh Truong.  Doc. 3 at 4 ¶ 3; App. at 299–301.

Truong was based at the agency's headquarters in Alexandria, Virginia.  App. at

65, 300.  He began working as a patent examiner for the USPTO in 2001 and, in 2013,

was promoted to the position of supervisory patent examiner.  *Id*. at 76, 78, 85–86.

Truong is Asian-American and was born in 1961.  *Id*. at 129.  Plaintiff, who continued to

work in the Dallas office, communicated with Truong by email, instant messaging,

telephone, and videoconference.  *Id*. at 295, 300, 302.  They never met in person.  *Id*. at

65, 78, 86–87, 300.  In addition to Truong's supervision, the Dallas office had a

supervisor—Peter Choi—who was available to Plaintiff.  *Id*. at 307–08.  Plaintiff's job,

with respect to each patent application to which he was assigned, was to (1) read the

application and understand the proposed invention, (2) conduct research on the "prior art"

to determine whether the proposed invention had already been invented, and (3) draft an

"office action" that the agency would send to the inventor or the inventor's attorney,

explaining the agency's decision with respect to the application.  *Id*. at 308–10; *see also*

*id*. at 7–8 (position description).  Office actions required supervisory approval for

examiners at Plaintiff's level, and Truong was responsible for approving Plaintiff's office

actions.  *Id*. at 7, 309.

The USPTO had (and continues to have) a significant backlog of unexamined

patent applications.  In July 2014, approximately two years before Plaintiff began

working at the USPTO, the agency had a backlog of approximately 620,000 applications.

*See* U.S. PATENT & TRADEMARK OFFICE, REPORT ON THE SATELLITE OFFICES, at 14

(2014).[3]  The average time from filing a patent application to the agency's first action

with respect to the application was 18.2 months, and the average "total pendency" time

---

[3] This report is available at
https://www.uspto.gov/sites/default/files/aia_implementation/USPTO_AIASatelliteOfficesReport_2014Sept30_Online.pdf.

was 29.1 months.  *See id*.  In September 2014, the USPTO reported to Congress that the

agency's goal was, by 2019, to reduce the average time to its first action from 18.2

months to 10 months and the average total application pendency time from 29.1 months

to 20 months.  *See id*.  One way in which the agency attempted to meet its goal was by

opening four satellite offices.  *See id*. at 14, 17.  The agency opened its first such office in

2012, after more than 200 years of operating only in the Washington, D.C. area.  *See id*.

at 1, 3.  In 2015, approximately one year before Plaintiff's USPTO employment began,

the USPTO opened the Texas Regional Office in Dallas, where Plaintiff worked.

 As a probationary examiner, Plaintiff was expected to progress toward completing

office actions for, on average, *at least three* patent applications every two weeks.  App. at

311–13.  And every two weeks on Mondays was the deadline for Truong and other

supervisors to submit finished office actions.  *Id*. at 313–14.  This day was known as

"count Monday."  *Id*.  Probationary examiners such as Plaintiff were not evaluated every

two weeks, however.  Rather, they were evaluated every couple of months.  *See id*. at 13–

16.  Thus, if a probationary examiner such as Plaintiff did not complete an office action

during any particular two-week period, for evaluation purposes it typically did not make

any difference that the office action was completed in a subsequent period.  *Id*. at 324–25.

There was generally no firm deadline for Plaintiff to submit work to Truong.  *Id*. at 314,

323–24.

 The USPTO's first evaluation of Plaintiff examined the work he had done through

January 2017, around the time he was finishing his training.  *Id*. at 15.  Mark

Featherstone, Plaintiff's second instructor, conducted the evaluation.  *Id*. at 15, 319.  He

found that Plaintiff needed improvement in 7 of 18 areas evaluated in Plaintiff's individual development plan.  *Id*. at 13–15.  Plaintiff's cumulative productivity in the prior two months was 8 percent and his cumulative productivity from his start date was 7 percent.  *Id*. at 14.  The percentages refer to the number of office actions Plaintiff *actually* completed, as a percentage of the number of office actions the USPTO *expected* someone at Plaintiff's level to complete, during a period of examining hours.  *See id*. at 78, 89. Thus, since Plaintiff was expected by the end of his probationary period to complete roughly three office actions every two weeks, if he completed three office actions in two weeks he would achieve a 100 percent rating.  *See id*. at 313.  Anything less than three office actions every two weeks would reduce the percentile rating.  Ratings of 8 percent and 7 percent meant that, on average, Plaintiff was *not completing even one* office action in two weeks.  *See id*. at 70 ("there were many biweeks when Mr. Marable turned in no work at all").[4]

After transitioning from "the Academy" into his art unit, Plaintiff's performance scarcely improved.  In March 2017, after Plaintiff had worked at the USPTO for

---

[4] Probationary examiners were expected to produce at a rate of 60 percent within six months of employment, at 80 percent within eight months, and at 95 percent by the end of the probationary year. App. at 70, 78, 81, 88–89, 334–35.  In addition to conducting Plaintiff's January 2017 evaluation, Featherstone also completed a review in March 2017, which was based on Plaintiff's performance through January 2017, and he held an appraisal meeting in April 2017.  *Id*. at 27–28, 30, 336–37.  He rated Plaintiff as overall "marginal."  *Id*. at 27; *see also id*. at 78, 100.  Plaintiff, in response to the review, submitted written comments in which he claimed Featherstone did not have adequate time to evaluate his work.  *Id*. at 29, 337.  Featherstone instructed and observed Plaintiff for two months, however.  *Id*. at 78, 95, 96, 102.  Moreover, others involved in Plaintiff's training also found Plaintiff's performance unsatisfactory.  Mark Zimmerman, Plaintiff's initial instructor (from September to November 2016), testified, "At that time, at least, he was slower than the rest of the class."  *Id*. at 78, 105.  And, in early December 2016, Mark Featherstone's supervisor Lesley Morris was concerned that Plaintiff had not yet turned in "a single case."  *Id*. at 12, 15.

approximately six months, Truong documented that Plaintiff needed improvement in 11 of 19 areas evaluated in Plaintiff's plan.  *Id*. at 13–15.  His cumulative productivity in the prior two months was 19 percent and his cumulative productivity from his start date was 11 percent.  *Id*. at 14.  This meant that, on average, it still took Plaintiff more than two weeks to complete a single office action.  Around the time Plaintiff received his six-month evaluation, he participated in a teleconference with Truong and Truong's supervisor, Andrew Wang.  *Id*. at 66, 303, 305–06, 333–34.  Plaintiff described the conversation as "a pep talk" in which the supervisors discussed the productivity levels they expected of him.  *Id*. at 306, 334.  Plaintiff admits his productivity numbers were "very low" and "probably the lowest in the history of the patent office."  *Id*. at 335; *see also id*. at 316 ("I don't think I was at that point where I was completing three cases every two weeks.").[5]  By the end of Plaintiff's eighth month of employment, in May 2017, Truong found that Plaintiff needed improvement in 12 of 19 areas, one more area than before.  *Id*. at 13–15.  In addition, Plaintiff's cumulative productivity for the prior two-month period had declined, from 19 to 12 percent, and his cumulative productivity from his start date remained the same at 11 percent.[6]  *Id*. at 14.  Truong discussed with Plaintiff that "he was not progressing satisfactorily" and that "he needed to improve."  *Id*.

---

[5] Plaintiff also admits that, besides possibly for applications that were pending shortly before he left the agency, all of the applications he worked on were approved and counted at some point—if not when he initially submitted them, due to corrections that needed to be made.  App. at 317, 318, 340.

[6] Plaintiff's underlying productivity data is contained in a report that can be found at page 73 of the appendix.  *See also* App. at 70 (referring to "a copy of Mr. Marable's productivity report for Pay Periods 2016-26 to 2017-19, showing a cumulative production rate of 12% for that time period.").  (As the USPTO's fiscal year begins on October 1, Plaintiff's September start date had him beginning work in the last period of the 2016 fiscal year.)

at 66; *see also id*. at 39 (mid-year review with acknowledgment that Truong held an appraisal meeting with Plaintiff on June 7, 2017).

In connection with both the six-month and eight-month evaluations, Truong noted that "although the examiner is not rated on production during the probationary period, the volume of work products created by the examiner during this probationary period is a crucial indicator of how well an examiner is learning, progressing and . . . most importantly, the quality of the examiner's work products." *Id*. at 15–16.  The USPTO uses the probationary period to evaluate whether new patent examiners will succeed in patent examination past the probationary period. *See id*. at 65–66, 71.  In June 2017, Timothy Callahan, a 25-year employee of the USPTO who was then serving as Truong's supervisor and Plaintiff's second-level supervisor, concluded that Plaintiff would not succeed as a patent examiner.[7]  *Id*. at 69, 71, 135, 304.  Therefore, Callahan issued Plaintiff, on June 26, 2017, a "Notification of Termination During Probationary Period," which was effective the following day.  *Id*. at 40–42, 71.  A supervisor in the Dallas office gave Plaintiff a copy of the notice, with Callahan—who worked in Virginia— participating by phone.  *Id*. at 69, 305–06, 343–44.  The notice explained that Plaintiff was being terminated because his "performance has not progressed at the rate expected of a new patent examiner," advised Plaintiff regarding his legal rights, and invited him to speak with personnel in the agency's Compensation and Benefits Division to discuss his benefits.  *Id*. at 40–42.

---

[7] Callahan is Caucasian and was born in 1958.  App. at 135.

Plaintiff contacted William Perry in the Compensation and Benefits Division the same day he received the termination notice. *See id.* at 38. At Plaintiff's request, Perry began working on paperwork for Plaintiff to retire rather than be terminated. *Id.* at 43, 52. However, as Perry began that process, he realized that an employee such as Plaintiff, for whom the Civil Service Retirement System applied rather than the Federal Employees Retirement System, must have at least one year of current federal service to be eligible for an immediate retirement. *Id.* at 53, 345. Because Plaintiff did not have one year of current service, he was not eligible.[8] *Id.* Perry advised Plaintiff accordingly, noting that Plaintiff could pursue a deferred retirement or elect to resign rather than be terminated. *Id.* at 46, 53. Plaintiff elected to resign. *Id.* at 46, 346. The resignation was effective on June 27, 2017, which was the effective date of the termination notice. *Id.* at 40, 44. Plaintiff left employment with the USPTO at the GS-9, step 10 level, which was the same level at which he began.[9] *Id.* at 9, 44, 379. Over the nine months in which Plaintiff worked at the agency, his salary increased by approximately $800. *Id.* at 9, 44.

---

[8] Plaintiff is now eligible for a federal retirement due to his current employment with the Department of Defense as a mechanical engineer, a position he has held since June 2018. App. at 293, 346, 382. It is not true, as Plaintiff alleges, that "Truong denied Plaintiff's written request to retire in lieu of termination." Doc. 3 at 8 ¶ 24. Plaintiff appears to be referring to an email message he sent Truong on May 31, 2017, in which he requested that "if you should decide to terminate my employment with the USPTO, I be allowed to resign or retire before you initiate any removal action." App. at 38. The agency attempted to process a retirement for Plaintiff, but he was not eligible, as discussed.

[9] As of Plaintiff's deposition on April 25, 2020, Plaintiff was working for the Department of Defense at the GS-12, step 2 level. App. at 379.

**B.      Due to Plaintiff's substandard performance when he worked at the USPTO, the agency chose not to rehire him.**

On October 23, 2017, approximately four months after departing the USPTO, Plaintiff applied for a "Patent Examiner (Computer Engineering)" position in the agency's Denver office.  *Id*. at 64, 119, 347.  The opening was listed under announcement number CP-2017-0032.[10]  *Id*.  The following month, USPTO hiring head Nancy Le recommended that Plaintiff "should not be considered for re-employment."  *Id*. at 74; *see also id*. at 138.  Le, who did not personally know Plaintiff, learned from Dallas supervisor Peter Choi that Plaintiff "was let go due to his inability to grasp the patent examiner job."  *Id*. at 74, 138, 261, 348.  She subsequently, on December 13, 2017, sent a memorandum to the USPTO's human resources office, requesting that management be allowed to pass over Plaintiff's application even though Plaintiff's status as a veteran gave him an advantage in the hiring process.  *Id*. at 107–08.  On January 19, 2018, the USPTO's human resources director, in turn, sent a memorandum to the Department of Commerce's human resources director, seeking the same approval.  *Id*. at 114–15.

The Department of Commerce approved the request, on March 23, 2018.  *Id*. at 385–86; *see also id*. at 142 (noting the approval date).  The basis for the approval was "Title 5, CFR § 731.202(b)(1), as Mr. Marable's conduct in his previous employment with the U.S. Patent and Trademark Office (USPTO) meets the definition of 'misconduct or negligence in employment,' which is a proper and adequate reason to pass over a preference eligible."  *Id*. at 385.  Specifically, when Plaintiff worked at the USPTO, he

---

[10] Plaintiff applied for additional positions at the USPTO, but only the position listed under announcement number CP-2017-0032 is at issue in this case.  *See* Doc. 3 at 11 ¶ 33; App. at 349.

"demonstrated an inability to properly carry out the duties and responsibilities of the position," "was unable to meet adequate standards," and "failed to accept instructions or respond to feedback from his supervisor." *Id*. Furthermore, Plaintiff's "employee evaluation shows he was rated as 'needs improvement' on a variety of major activities, including checking applications for compliance with formal requirements of patent status and rules, and checking applications for technological accuracy, among other things." *Id*. Finally, "Mr. Marable's cumulative activity for the last four bi-weeks of his employment was 12 percent—below the fully successful range of 95–120 percent." *Id*. Plaintiff was not rehired. *Id*. at 347.

## C.    Plaintiff filed an administrative complaint and the instant federal complaint.

On August 17, 2017, after Plaintiff's separation from the agency but before he applied for the patent examiner position in Denver, Plaintiff filed an administrative complaint alleging race and age discrimination and a hostile work environment.[11] *Id*. at 49–51, 55, 61. On January 2, 2018, Plaintiff sent a letter to the agency's Office of Equal Employment Opportunity and Diversity, stating that he wished to amend his complaint to include not being selected for the patent examiner position announced under number CP-2017-0032.[12] *Id*. at 109. Neither the administrative complaint nor the amendment

---

[11] Plaintiff also alleged discrimination based on his status as a veteran. App. at 50–51, 55. The agency dismissed for failure to state a claim any claim based on veteran's status. *Id*. at 111. Veteran's status is not a protected category under Title VII. *See* 42 U.S.C. § 2000e–2(a); *Wood v. Fla. Atl. Univ. Bd. of Trustees*, 432 F. App'x 812, 816 (11th Cir. 2011) ("[V]eterans, as a group, are not protected under Title VII.").

[12] Plaintiff claimed that his non-selection reflected discrimination against him "for being both an African American and a veteran." App. at 109. As discussed, Title VII does not include protection for veterans.

includes a claim of retaliation.  *Id.* at 49–51, 109.  A couple of weeks after receiving

Plaintiff's proposed amendment, the agency accepted the following three claims for

investigation:

> Whether Complainant, a former patent examiner GS-1224-09, was discriminated against on the bases of race (African-American), age (DOB: x/x/1953) when:
>
> 1. Since on or about September 19, 2016 through June 26, 2017, Complainant was subjected to a hostile work environment by his supervisor who regularly berated and disparaged him, accused Complainant of being a liar, deliberately kept Complainant from meeting his production goals, and forced Complainant to work on federal holidays and the weekends without compensation.
>
> 2. On or about June 26, 2017, the Agency removed Complainant from federal service during his probationary period.
>
> 3. On an unspecified date, Complainant was not selected for the position of patent examiner, vacancy announcement CP-2017-0032.

*Id.* at 110–13.  On December 14, 2018, Plaintiff filed a complaint in this Court, which

includes allegations pertaining to the three accepted issues, as well as a retaliation

claim.[13]  *See* Doc. 3.  The USPTO subsequently moved to dismiss the administrative

---

*See supra* note 11.  Plaintiff's amendment request does not allege discrimination on the basis of age. App. at 109.

[13] Plaintiff also filed a previous complaint and "request for emergency temporary restraining order and preliminary injunction" in this Court on November 1, 2017, requesting to be reinstated at the USPTO "pending resolution of Plaintiff's administrative appeal with the Merit Systems Probation [*sic*] Board (MSPB)."  *Marable v. Dep't of Commerce*, No. 3:17-cv-3030-D (N.D. Tex. Nov. 1, 2017), ECF No. 3, at 4.  He claimed to have filed an appeal with the MSPB on July 27, 2017.  *Id.*  This Court dismissed Plaintiff's prior case for lack of subject-matter jurisdiction.  *See id.* at 2018 WL 3869577, at *1 (N.D. Tex. Aug. 15, 2018).  Plaintiff states in the current complaint that "the District Court shall review MSPB decisions."  Doc. 3 at 2.  MSPB decisions may be appealed only to the U.S. Court of Appeals for the

action, as Plaintiff's filing of the instant case terminated the administrative process.  *See*

29 C.F.R. § 1614.409; App. at 169–95.  The Equal Employment Opportunity

Commission granted the motion.  App. at 196–97.

## IV.    Argument and Authorities

### A.    Standard of Review

To prevail on a motion for summary judgment, the moving party has the initial

burden of showing "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue is 'material' if it involves a fact

that might affect the outcome of the suit under the governing law."  *Burgos v. Sw. Bell*

*Tel. Co*., 20 F.3d 633, 635 (5th Cir. 1994).  If the moving party presents evidence

showing no dispute of material fact, the opposing party must then identify specific

evidence in the record showing a genuine fact issue.  *See Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 256–57 (1986).  Conclusory allegations are not competent summary

judgment evidence, and thus are insufficient to defeat a summary judgment motion.

*Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  In analyzing the parties' evidence,

the Court must view the facts and the inferences to be drawn in the light most favorable

to the non-movant.  *See Herrera v. Millsap*, 862 F.2d 1157, 1159 (5th Cir. 1989).  In

addition, courts must construe *pro se* allegations and briefs liberally and hold them to less

stringent standards than formal pleadings drafted by lawyers.  *See SEC v. AMX, Int'l,*

---

Federal Circuit.  *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) (citing 28 U.S.C. § 1295(a)(9) & 5
U.S.C. § 7703(b)(1)).

*Inc.*, 7 F.3d 71, 75 (5th Cir. 1993).  However, summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

**B.    Defendant is entitled to summary judgment on Plaintiff's Title VII and ADEA claims.**

**1.    Plaintiff named the wrong defendant.**

As mentioned in Defendant's answer, the USPTO—not the Department of Commerce—is the relevant agency in an employment action filed by a USPTO employee.  *See* Doc. 13 at 1 n.1.  Under 35 U.S.C. § 1(a), the USPTO maintains certain independence from the Department of Commerce, including independent control of its personnel decisions and other administrative and management functions.  With respect in particular to Plaintiff's claims pursuant to Title VII and the ADEA, the proper defendant is the *director* of the USPTO, not the agency itself.  *See* 42 U.S.C. § 2000e–16(c); *Honeycutt v. Long*, 861 F.2d 1346, 1349 (5th Cir. 1988) (dismissing a suit under Title VII and the ADEA (and the Rehabilitation Act) for failure to name the agency head as defendant); *see also Varma v. Gutierrez*, 421 F. Supp. 2d 110, 113 (D.D.C. 2006) (in a case that included Title VII and ADEA claims, holding that "the Director of the USPTO, . . . as the head official of the USPTO—the alleged discriminating agency—is the proper defendant.").  Plaintiff failed to name the director of the USPTO as a defendant in his suit and, despite the note in Defendant's answer, did not amend his complaint or otherwise seek to join the USPTO director as a party.  This Court therefore has "no alternative but

to dismiss the [claims] for lack of a proper party defendant." *Quevedo v. Army & Air Force Exch. Serv.*, 234 F.3d 29, at *1 (5th Cir. 2000). Plaintiff's *pro se* status does not relieve him from complying with the law. *See id.* Due to Plaintiff's failure to sue the correct party, Plaintiff's Title VII and ADEA claims should be dismissed. Out of an abundance of caution, however, Defendant will proceed with further argument.

### 2. Plaintiff has not shown discrimination or retaliation.

Plaintiff's discrimination and retaliation claims cannot survive even the prima facie analysis of the *McDonnell Douglas* analysis.[14] On the discrimination claim, although Plaintiff has shown that he is a member of a protected class, and Defendant concedes that his proposed removal and non-selection were both adverse actions, Plaintiff has *not* shown—as he must—that he was treated less favorably than similarly situated employees outside his protected groups. The only comparators Plaintiff names are Kenneth Beyers and David Deal. *See* Doc. 3 at 5 ¶ 8 ("The Agency allowed some Caucasian Engineers, who failed to meet their production quotas, to be selected to permanent status (Kenneth Beyers and several others), whereas all of the African

---

[14] Where, as here, a plaintiff has no direct evidence of discrimination or retaliation (*see* App. at 350, 355, 357–60, 376–78) but must rely only on circumstantial evidence, the three-step analysis introduced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See McDonnell Douglas*, 411 U.S. at 802–04; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). The Fifth Circuit "applies the *McDonnell Douglas* rubric to both Title VII and ADEA claims." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 n.2 (5th Cir. 2002). A plaintiff must first establish by a preponderance of the evidence a prima facie case. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). For a discrimination claim, a plaintiff must show that he (1) is a member of a protected class, (2) suffered an adverse employment action, and (3) was treated less favorably than similarly situated employees outside his protected group. *See McCoy*, 492 F.3d at 556. A prima facie case of retaliation requires a plaintiff to establish that (1) he participated in a protected activity, (2) his employer took an adverse employment action against him, and (3) there is a causal connection between the protected activity and the adverse action. *See Heggemeier v. Caldwell Cnty., Tex.*, 826 F.3d 861, 869 (5th Cir. 2016).

American Engineers were the first ones to be immediately terminated."); Doc. 3 at 5 ¶ 9

("The Agency allowed prior Caucasian Patent Examiners (David Deal, Kenneth Beyers,

and several others) to be rehired, whereas they vehemently denied Plaintiff's

reemployment applications."). Plaintiff presents no evidence showing Beyers' or Deal's

performance at the USPTO, or any decision on the part of the USPTO to retain or rehire

them despite poor performance.[15] "Merely identifying other employees who he believed

enjoyed more opportunities is insufficient." *Pollak v. Lew*, 542 F. App'x 304, 307–08

(5th Cir. 2013) (affirming grant of summary judgment to the government) (citation and

internal quotation marks omitted).[16] Plaintiff has not made a prima face case of

discrimination.

    Regarding Plaintiff's retaliation claim, as an initial matter Plaintiff has not

exhausted any such claim. *See* App. at 49–51, 109 (no retaliation claim in administrative

---

[15] Due to Beyers' transfer out of the USPTO, the USPTO no longer possesses Beyers' personnel file. *See* App. at 356 (confirming transfer). As for Deal, the USPTO rehired him in September 2016, the month Plaintiff began working at the agency. *Id*. at 10. Deal had resigned in 2001 because he was relocating. *Id*. at 11. The USPTO possesses only Deal's more recent performance reviews, none of which have been negative. *See id*. at 144–68.

[16] Plaintiff also claims that two other white employees, James Miller and William Weller, were treated more favorably because they were subject to two-year, not one-year, probationary periods. *See* Doc. 3 at 6 ¶ 10; App. at 351–53. Plaintiff is correct that the probationary periods for Miller and Weller were two years. App. at 3–4. However, the reason for the longer period is that Miller and Weller were hired using the Veterans Recruitment Appointment authority, which requires employees to perform two years of satisfactory excepted service before the appointment is converted to the competitive service. *See id*. at 201; *see also Special Hiring Authorities for Veterans*, https://www.fedshirevets.gov/job-seekers/special-hiring-authorities/ (last visited May 29, 2020). Plaintiff was required to serve only a one-year probationary period because he applied for and was hired directly into the competitive service. *See* App. at 201; *see also* 5 C.F.R. §§ 315.801–802. In any event, it is not clear that a longer probationary period is advantageous. If the USPTO decides to remove a probationer, the agency's only obligation is to notify the probationer "in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). A longer probationary period does not mean an employee will have a longer period of employment with the agency, as the USPTO does not terminate employees only toward the end of the probationary period. *See, e.g.*, App. at 238 (one-year probationary employee terminated after three months).

---

**Brief in Support of Defendant's Motion for Summary Judgment – Page 16**

complaint or amendment).  "[F]ederal courts have no jurisdiction over federal employees'

Title VII claims—including those for retaliation—until administrative remedies have

been exhausted." *Higareda v. U.S. Postal Serv*., 5 F.3d 1495, at \*1 (5th Cir. 1993) (per

curiam); *see also* 42 U.S.C. § 2000e-16(c).  Regardless, to the extent Plaintiff now claims

retaliation, his retaliation claim fails on the merits.  As with Plaintiff's discrimination

claim, Plaintiff cannot make a prima facie showing of retaliation.  Defendant concedes

that Plaintiff participated in protected activity and that his non-selection for

reemployment was an adverse action, but disputes that Plaintiff has shown any causal

connection between the protected activity and the non-selection.[17]  His argument on

causal connection appears to be as follows: "[O]n or about 17 Jan 2018, a couple of

weeks after I filed my amended EEO complaint, USPTO HR submitted a bad faith

request to DOC asking for permission to not hire me for the subject vacant position."  *Id*.

at 140; *see also id*. at 114–15 (the referenced memorandum, dated January <u>19</u>, 2018).

"Mere timing alone is insufficient in this instance to satisfy the causation element of the

prima facie case."  *Bell v. Bank of Am*., 171 F. App'x 442, 444 (5th Cir. 2006).  The

referenced memorandum was just one in a chain of several.  *See id*. at 74–75, 107–08,

385–86.  The initial memorandum, signed by Nancy Le and mentioning Peter Choi, is

dated November 30, 2017.  *Id*. at 74–75.  Moreover, neither Le nor Choi was the subject

of Plaintiff's EEO activity, nor did they even know about it.  *Id*. at 198–99, 261–62.

Truong and Callahan were not consulted on Plaintiff's application for reemployment and

---

[17] Plaintiff alleges retaliation only with respect to the non-selection, not the proposed removal.  App. at 361.

had no role in the non-selection decision.  *Id*. at 132, 136.  Plaintiff's attempt to show a

causal connection fails.

Assuming only for the sake of argument that Plaintiff had made a prima facie

showing of discrimination and retaliation, which Defendant denies, Plaintiff's claims

cannot survive the subsequent steps in the *McDonnell Douglas* analysis.  The USPTO

had legitimate, nondiscriminatory and nonretaliatory reasons for proposing to terminate

Plaintiff and not rehiring him.[18]  Plaintiff's supervisors found he needed to improve in

many areas, and the areas that needed improvement only increased over time.  *See id*. at

13–15 (7 of 18 areas in January 2017, 11 of 19 areas in March 2017, and 12 of 19 areas in

May 2017); *Miller v. Locke*, No. 1:08-CV-1149 (AJT/TCB), 2009 WL 1675486, at *5

(E.D. Va. June 12, 2009) (finding that the USPTO's statement that a probationary

examiner needed improvement in several areas was a legitimate, non-discriminatory

reason for the examiner's termination); *see also Shackelford v. Deloitte & Touche, LLP*,

190 F.3d 398, 408 (5th Cir. 1999) ("[P]oor performance . . . is a legitimate, non-

discriminatory justification" for terminating an employee.).  In addition, Plaintiff did not

come anywhere near the level of production expected of him.  *See Spencer v. FEI, Inc*.,

725 F. App'x 263, 267 (5th Cir. 2018) (an employee's "limited productivity . . . [is]

---

[18] "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action."  *McCoy*, 492 F.3d at 557.  The employer's burden is only one of production, not persuasion, and "can involve no credibility assessment."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  Once the defendant articulates its legitimate, nondiscriminatory or nonretaliatory reason, any presumption of discrimination or retaliation created by the plaintiff's prima facie case disappears.  *See Machinchick v. PB Power, Inc*., 398 F.3d 345, 350 (5th Cir. 2005) (applying to discrimination claim); *Septimus v. Univ. of Houston*, 399 F.3d 601, 610–11 (5th Cir. 2005) (applying to retaliation claim).

sufficient to shift the burden back" to the employee).  In fact, as decisionmaker Callahan noted, Plaintiff's already low production actually dropped between the six-month and eight-month evaluations.  *See id*. at 14, 78, 80.  "I am unaware of any other probationary Patent Examiner who was retained with a production rate as low as Mr. Marable at this point in the probationary period," Callahan attested.  *Id*. at 70–71.  "I am aware that we have removed probationary Patent Examiners who had higher production levels than Mr. Marable," he added.  *Id*. at 71.

Indeed, in the calendar years when Plaintiff worked at the USPTO, the USPTO discharged—all on the basis of performance—ten probationary examiners who are *not* African-American and, at the time of discharge, were younger than 40 years old.[19]  *Id*. at 200–01.  Moreover, these ten examiners' productivity percentages were substantially *higher* than Plaintiff's.  *See id*.  At three-and-a-half months, Plaintiff's cumulative productivity rate from his start date was 7 percent.  *Id*. at 14.  The same rate for the ten terminated examiners not belonging to Plaintiff's protected categories ranged from 7 to 54 percent, with an average rate of 21.8 percent.  *Id*. at 201.  At six months, Plaintiff's cumulative productivity rate was 11 percent.  *Id*. at 14.  The same rate for the ten terminated examiners ranged from 18 to 53 percent, with an average rate of 30.6 percent.  *Id*. at 201.  Lastly, at eight months, Plaintiff's cumulative productivity rate was again 11 percent.  *Id*. at 14.  The same rate for the ten terminated examiners ranged from 20 to 56 percent, with an average rate of 34.1 percent.  *Id*. at 201.  Given that the USPTO

---

[19] Four of these ten examiners worked in the Dallas office.  App. at 201.  Another Dallas examiner, an older white man named Craig Bohren who Plaintiff knew, was also terminated based on performance.  *Id*. at 354–55.

discharged higher-performing examiners who are not African-American and who were younger than 40 years old, Plaintiff's claim that he was terminated on the basis of race and age makes little sense.  His performance was clearly below what was necessary to be retained.  Neither race nor age, nor any other protected characteristic, factored into the termination decision.[20]  *See id*. at 72.

Like the termination decision, the decision to pass over Plaintiff's application for reemployment was also based on his performance, and Plaintiff was treated the same as other applicants with histories of poor performance at the agency.  As before, race and age were irrelevant.[21]  EEO activity was also irrelevant.[22]  From 2016 to early 2020, the USPTO passed over seven applicants who qualified for preference due to their status as veterans; are not African-American; and, at the time of the pass over, were younger than 40 years old.  *Id*. at 263–64.  In addition, only one of the other seven applicants had engaged in EEO activity.  *Id*. at 264.  The reasons for the pass over decisions varied, but most of the decisions—like the one made with regard to Plaintiff—were due to poor performance during prior employment with the USPTO.  *See id*.  It is not surprising that the agency is not interested in rehiring employees it has already determined cannot meet its performance expectations.  *Cf. Fontenot v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, No. CV H-06-3756, 2008 WL 11487950, at *5, 11, 14 (S.D. Tex. Apr. 15, 2008) (finding

---

[20] Truong did not know Plaintiff's age while they worked together, and Callahan had never met Plaintiff before his dismissal.  App. at 129, 135.

[21] Nancy Le, the hiring head who recommended that Plaintiff not be considered for reemployment, was not aware of Plaintiff's race or age.  App. at 138.

[22] As noted, neither Le nor Choi knew about Plaintiff's EEO activity.  App. at 198–99, 261–62.

that "issues raised in Plaintiff's prior performance review" was a legitimate nondiscriminatory and nonretaliatory reason not to rehire the plaintiff).  In the case of Plaintiff here, his performance was low even relative to other discharged employees, making it not a difficult decision not to rehire him.

Any attempt on the part of Plaintiff to show pretext would be futile.[23]  In deciding to terminate Plaintiff and reject his application for reemployment, the agency relied on the consensus opinion of multiple supervisors as well as on objective production measures that failed to improve, despite the supervisors' repeated warnings to Plaintiff.[24] *Cf. Wright v. Brown*, 993 F.2d 1541, at *5 (4th Cir. 1993) (where the plaintiff "had repeatedly been warned about the potential consequences of his failure to meet production requirements," finding no evidence that the USPTO's proffered nondiscriminatory and nonretaliatory reasons were a pretext); *see also Cook-Adams v. Sw. Bell Tel. Co.*, No. 3:97-CV-1629, 1998 WL 355475, at *1 (N.D. Tex. June 30, 1998)

---

[23] The plaintiff bears the ultimate burden of showing by a preponderance of the evidence that the employer's proffered reasons are not true but instead are a pretext for the real discriminatory or retaliatory purpose.  *See Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253; *McCoy*, 492 F.3d at 557.  The plaintiff must prove that the adverse employment actions would not have occurred "but for" the plaintiff's protected category or conduct.  *See Jenkins v. State of La., Through Dep't of Corrs.*, 874 F.2d 992, 997 (5th Cir. 1989) (addressing discrimination claim); *Strong v. Univ. Healthcare Sys.*, L.L.C., 482 F.3d 802, 806 (5th Cir. 2007) (addressing retaliation claim).  With respect to Plaintiff's ADEA claim, "but for" causation is necessary only to obtain certain forms of relief.  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177–78 (2020).  The ADEA's federal-sector provision "demands that personnel actions be untainted by any consideration of age."  *Id.* at 1171.

[24] In addition to the discussions Plaintiff's supervisors had with Plaintiff in connection with his evaluations (*see* App. at 28, 39, 66, 303–06, 333–34), in May 2017 Truong also cautioned Plaintiff twice by email.  First, Truong asked Plaintiff why he had not submitted any cases in the past two-week period and warned that he needed "to complete ample reviewable work products prior to the next review in order to provide the Office with a better assessment of [Plaintiff's] overall performance and to demonstrate progression."  App. at 31–32, 337–38.  Second, Truong again expressed concern that Plaintiff had posted so few office actions, and advised that he needed to show "significant improvement in order to be retained."  *Id.* at 33, 339.

("Faced with this undisputed evidence [that an employer "terminated the plaintiff after repeated warnings about her poor attendance"], no reasonable jury could conclude that the legitimate explanation . . . is a pretext for unlawful discrimination.").  Plaintiff's discrimination and retaliation claims fail.

### 3.    Plaintiff has not shown a hostile work environment.

Plaintiff claims that he "was subjected to a hostile work environment by his supervisor, Mr. Thanh Troung [*sic*]."  Doc. 3 at 6 ¶ 11; App. at 362.  In his complaint, Plaintiff asserts that the hostile work environment occurred the entire time he worked at the USPTO.  Doc. 3 at 6 ¶ 11.  At his deposition, Plaintiff claimed the hostile work environment began in "October and November" 2016, within a couple months after his start date.  *Id*. at 362.  According to Plaintiff, "Mr. Truong regularly berated and disparaged the Plaintiff; accused Plaintiff of being a liar; deliberately kept Plaintiff from meeting his performance goals; and forced Plaintiff to work on federal holidays and the weekends without any additional compensation for over-time and/or holiday pay."  Doc. 3 at 6 ¶ 11.  But Plaintiff has not shown, as he must for a hostile work environment claim, that he was subjected to harassment; that the alleged harassment was based on a protected characteristic; that it affected a term, condition, or privilege of employment; and that the USPTO knew or should have known of the alleged harassment and failed to take prompt remedial action.[25]  Each allegation will be discussed in turn.

---

[25] To establish a hostile work environment claim, a plaintiff must prove all the elements of the claim: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on a protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *See Ramsey v. Henderson*, 286 F.3d

*First*, Plaintiff claims that Truong "regularly berated and disparaged" him. There appear to be three alleged incidents that make up this claim: (1) Plaintiff contends Truong told him that, if he had hired Plaintiff, he would have started Plaintiff at a lower grade level so that his production quota would be lower. Doc. 3 at 6 ¶ 15; App. at 378–79. In connection with this alleged statement, Plaintiff also contends Truong said Plaintiff was still "good for the job." App. at 370–71. (2) Plaintiff claims that Truong hung up the phone on him twice and "immediately called the Plaintiff back." Doc. 3 at 7 ¶ 20; App. at 363. (3) Plaintiff alleges that Truong "mock[ed] his accent and his purported inability to pronounce certain words." Doc. 3 at 8 ¶ 22; App. at 375. *Second*, Plaintiff claims Truong once accused him of being a liar. According to Plaintiff's complaint:

> One time, Mr. Truong assigned a Caucasian junior patent examiner (PE) to work with Plaintiff. Mr. Truong literally ordered the Plaintiff to follow the PE's instructions and to not question his analysis. Mr. Truong was angrily upset when Plaintiff submitted his work to him, because it was not done correctly. When Plaintiff explained that his original analysis was correct and completely different than the PE's, Mr. Truong vociferously called the Plaintiff a liar. Plaintiff had to email Mr. Truong his original draft as proof.[26]

---

264, 268 (5th Cir. 2002). To affect a term, condition, or privilege of employment, the harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations and internal quotation marks omitted). "Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

[26] Defendant has not identified any such email message in the record, nor has Plaintiff produced any such record.

Doc. 3 at 7 ¶ 17; *see also* App. at 371–72.  *Third*, Plaintiff claims Truong "deliberately

kept Plaintiff from meeting his performance goals."  Doc. 3 at 6 ¶ 11.  Below, Defendant

summarizes the relevant evidence on this issue.

| Date | Event Related to Plaintiff's Ability to Meet His Performance Goals | References |
|---|---|---|
| 2/6/17 | So long as Plaintiff worked 80 hours every two weeks, Plaintiff was able to choose the number of hours he worked each day. | App. at 17, 315 |
| 2/15/17 | Truong emailed Plaintiff sample office actions "as examples of how to write up an office action," and told Plaintiff to ask him if he had any questions.  Relatedly, Truong testified that he intentionally assigned Plaintiff easier applications, hoping that doing so would increase Plaintiff's confidence and allow him to progress toward working on harder cases. | App. at 18, 78, 90, 320–21 |
| 2/16/17 | Plaintiff asked Truong whether Truong would cancel a meeting they had scheduled for that day so Plaintiff could continue working on an office action and, one minute later, Truong granted Plaintiff's request. | App. at 19, 321–22 |
| 3/13/17 | Plaintiff asked to consult with Truong about which prior art to use for a particular patent application.  Truong replied about ten minutes later, arranging for them to meet the following day.  Truong also instructed Plaintiff to seek additional help from another examiner, Steve Gerrity, about "how to write a restriction."  Plaintiff testified that he received help from Gerrity. | App. at 22, 126, 326–28, 330, 367 |
| 3/16/17 | Truong documented that he had spent three hours working with Plaintiff on his office action, including providing him with prior art, and that Gerrity had spent three days working with Plaintiff on the application. | App. at 23, 330, 332 |
| 3/16/17 | Plaintiff informed Truong that he had rewritten his office action "to correspond with what we discussed in our consultation meeting on Tuesday."  He also told Truong that "words can't express my gratitude for all you have done for me." | App. at 24, 332 |
| 3/18/17 | Truong instructed Plaintiff that his office action "should only include references that [are] relevant to the subject matter and do not include references that [are] already cited by the applicant."  Truong told Plaintiff to call him if he had any questions.  Plaintiff responded that he made the corrections and reposted the case. | App. at 25, 332–33 |
| 3/31/17 | Plaintiff requested an additional two hours to post his application.  A half-hour later, Truong responded that the additional time was fine.  He noted that because he needed to sign the application by noon on Monday, Plaintiff should "plan to be in [the] office early on Monday if there are corrections to be made." | App. at 26, 335–36 |

| | | |
|---|---|---|
| 5/31/17<br>6/1/17 | Plaintiff asked Truong for permission "to search three cases at the same time." The next morning, Truong responded that Plaintiff is "allowed to search as many cases as you wish," although he suggested that Plaintiff focus on one case at a time. Truong noted that, in two of Plaintiff's recent cases, Truong had found the prior art and wrote the office action for Plaintiff. (At his deposition, Plaintiff confirmed that Truong helped him find prior art and wrote an office action for him.) Plaintiff replied that he would do as Truong suggested. "I do appreciate you taking the time to help make me an awesome Examiner," Plaintiff remarked. | App. at 341–42, 388–89 |

Therefore, contrary to Plaintiff's assertion, the record shows Truong did everything he could to *help* Plaintiff meet his production goals and, as a result, help the agency meet *its* goal of reducing the patent-application backlog.

*Lastly*, Plaintiff alleges Truong forced him "to work on federal holidays and the weekends without any additional compensation for over-time and/or holiday pay" and that "[t]here were numerous of times Mr. Truong had Plaintiff to work more than 50 (fifty) hours/week without pay."[27]  Doc. 3 at 6 ¶ 11; 8 ¶ 25.  Plaintiff admits, however, that he never requested overtime pay, and he knows no probationary examiner who earned such pay.  App. at 368.  When asked if he worked overtime because someone told him to, Plaintiff responded: "You know, trying to do the best job I could do, whatever it took."  *Id*. at 381.  Indeed, to the extent Plaintiff worked extra hours, he did so voluntarily.  On Presidents' Day, for example, Plaintiff "had planned on coming to work on Monday" in order to post his work in time to get credit during that pay period.  *Id*. at 20, 325.  Truong tried to help by giving Plaintiff an extension.  "I was permitting Complainant to wait until Monday to submit his work, instead of having to have his cases to me by Friday," Truong explained.  *Id*. at 131; *see also id*. at 78, 84.

---

[27] These allegations also form the basis of Plaintiff's Fair Labor Standards Act claim.  For Defendant's argument as to why Plaintiff's FLSA claim fails, *see infra* Part IV.C.

Plaintiff also claims he was forced to work on Memorial Day because Truong refused to approve his work early, on the Thursday ahead of time.  *See* Doc. 3 at 9 ¶ 28; App. at 364–65.  The only email record pertaining to this allegation is a message from Truong on Thursday, May 25, 2017, alerting his staff that he would be working at an agency picnic during the day but teleworking in the morning and evening.  App. at 387. Plaintiff contends that, in the evening on that day, "Mr. Truong finally signed in on his computer, he saw that Plaintiff was still at work, thus Mr. Truong immediately signed off of his computer."  Doc. 3 at 9 ¶ 28; *see also* App. at 366.  A record showing Truong's computer activity that day does not corroborate Plaintiff's allegation, however.  *See* App. at 35–37.  Truong unlocked his computer at 3:46 pm and locked it for the day at 5:32 pm. *Id*. at 35.  Even if Plaintiff was somehow prevented from having his work approved on that day, Plaintiff had already just received his eight-month evaluation on May 23, 2017, and would not receive another evaluation until the eleven-month mark.  *Id*. at 13–16.

Taking together all of Plaintiff's allegations regarding a hostile work environment, the allegations fail as a matter of law.  None of the alleged harassment was based on a protected characteristic.[28]  Furthermore, Plaintiff has not shown that any action occurred on an ongoing basis, was physically threatening or humiliating, or unreasonably

---

[28] Although in his complaint Plaintiff stated that "Mr. Truong routinely made comments to the Plaintiff suggesting that he was not best suited for the job than his younger millennial coworkers," at his deposition Plaintiff made no mention of this—despite being asked repeatedly if anything else formed his hostile work environment claim—and he affirmatively testified that Truong never made any statements referring to Plaintiff's race or age.  Doc. 3 at 6 ¶ 14; App. at 364, 370, 373, 374, 376–77.  As mentioned, Truong is Asian-American and, when he supervised Plaintiff, he was 55 years old.  *See* App. at 129, 377–78.

interfered with his work performance.[29]  *See id*. at 378.  Indeed, Plaintiff and Truong

worked in different states and never met in person.  *Id*. at 65, 78, 86–87, 300.  Finally,

Plaintiff has not shown that the USPTO knew or should have known of any harassment

and failed to take prompt remedial action.  Plaintiff admits that, although he could have

complained, he did not complain about Truong to any other supervisor.  *Id*. at 304–05,

307; *see also id*. at 78, 79, 83, 135.  He also admits he never complained to the union,

although he belonged to the bargaining unit.  *Id*. at 369–70.  *See Jackson v.*

*DaimlerChrysler Corp*., No. 3:03-CV-614-P, 2004 WL 690840, at *5 (N.D. Tex. Mar.

30, 2004) (Because "it is undisputed that [the plaintiff] never complained of or reported

any of the alleged incidents of harassment . . . to his union, supervisors, or managers until

after his termination . . . . [he] cannot claim that [the employer] reasonably knew or

should have known about the alleged harassment and failed to take prompt remedial

action.").  Plaintiff's claim of a hostile work environment must be dismissed.

## C.   Defendant is entitled to summary judgment on Plaintiff's Fair Labor Standards Act claim.

Plaintiff brings a claim under the Fair Labor Standards Act for alleged unpaid

overtime.  *See* Doc. 3 at 1, 20; App. at 380–81.  He does not know how many overtime

---

[29]A supervisor's comments to an employee that "she needed to improve her spoken and written English communication skills . . . do not rise to the level necessary to create liability . . . for a hostile work environment."  *Von Graupen v. Burlington Coat Factory of Tex., L.P.*, No. 4:11-CV-868-A, 2013 WL 1143359, at *9 (N.D. Tex. Mar. 19, 2013).  A supervisor's calling an employee a liar is also insufficient to state a hostile work environment claim.  *See Ramsey v. Henderson*, 286 F.3d 264, 266, 270 (5th Cir. 2002).  Allegations of "sabotage," loss of privileges, increased supervision, and invasion of personal work space are likewise insufficient to state a claim for actionable harassment.  *Young v. Dallas Indep. Sch. Dist*., No. 3:16-CV-543-N-BF, 2017 WL 4326009, at *4 (N.D. Tex. Sept. 6, 2017), *report and recommendation adopted*, No. 3:16-CV-543-N-BF, 2017 WL 4326091 (N.D. Tex. Sept. 27, 2017) (citing *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, at *7 (5th Cir. 2014)).

hours he worked.  App. at 381.  The Fair Labor Standards Amendments of 1974 extended

the protections of the Fair Labor Standards Act of 1938 to federal employees.  *Gomez-*

*Perez v. Potter*, 553 U.S. 474, 499 (2008) (Roberts, C.J., dissenting).  As an initial matter,

Plaintiff's FLSA claim is time-barred to the extent it applies to Plaintiff's first few

months of employment at the USPTO.  A cause of action for unpaid overtime brought

under the FLSA "shall be forever barred unless commenced within two years after the

cause of action accrued, except that a cause of action arising out of a willful violation

may be commenced within three years after the cause of action accrued."  29 U.S.C.

§ 255(a).  The FLSA plaintiff bears the burden of showing that an employer's violation

was willful.  *See Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990).  "[A]

negligent violation of the FLSA is not willful, nor is a good faith but incorrect

assumption that a pay plan complied with the FLSA."  *Valcho v. Dallas Cnty. Hosp.*

*Dist.*, 658 F. Supp. 2d 802, 808 (N.D. Tex. 2009) (citation and internal quotation marks

omitted).  Plaintiff filed his complaint on December 14, 2018.  *See* Doc. 3.  Therefore,

unless Plaintiff could show willfulness, which he cannot, any claim arising from conduct

that occurred before December 14, 2016 is time-barred.

Moreover, Plaintiff's entire FLSA claim fails on the merits because Plaintiff's

position with the USPTO was exempt under the FLSA, as Plaintiff acknowledges.  *See*

App. at 380; *see also id.* at 9, 44 (Standard Forms 50 showing Plaintiff's FLSA category

was "exempt").  Employees such as Plaintiff, who are "employed in a bona fide

executive, administrative, or professional capacity" are exempt from the FLSA's

protections.  *See* 29 U.S.C. § 213(a)(1); *see also Al-Beshrawi v. Chao*, No. 5:06CV369,

2007 WL 1231477, at *7 (N.D. Ohio Apr. 23, 2007) ("At the USPTO, all patent examiners at the grade level GS-9 and above are exempt from FLSA coverage based on the 'professional' exemption.").  Plaintiff's position was at the GS-9 level.  App. at 9, 44.  "Regardless of [Plaintiff's] subjective views on the nature of his work, the fact remains that, throughout his tenure at the USPTO, he was in a position that was exempt from FLSA coverage."  *Al-Beshrawi*, 2007 WL 1231477, at *7 (granting the USPTO's motion for summary judgment).  The FLSA claim cannot prevail.

## V.      Conclusion

For the foregoing reasons, this Court should grant Defendant's motion for summary judgment.  Further, the Court should dismiss Plaintiff's claims against Defendant with prejudice, tax costs against Plaintiff, and grant Defendant all other relief to which it is entitled.

Respectfully submitted,

ERIN NEALY COX
United States Attorney

/s/ Lisa R. Hasday
Lisa R. Hasday
Assistant United States Attorney
Texas Bar No. 24075989
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8737
Facsimile:   214-659-8807
lisa.hasday@usdoj.gov

Attorneys for Defendant

<u>Certificate of Service</u>

On May 29, 2020, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ Lisa R. Hasday</u>
Lisa R. Hasday
Assistant United States Attorney